# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

**KEITH CHIARO**, *on behalf of himself and* )
*all others similarly situated*,                      )
                                                                     )
      **Plaintiff,**                                 )     Case No. 1:23-cv-1051-SEB-MKK
                                                                     )     (Judge Sarah Evans Barker)
**v.**                                                             )
                                                                     )
**THE METHODIST HOSPITALS, INC.,**   )
                                                                     )
      **Defendant.**                             )
                                                                     )
                                                                     )

## AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff, KEITH CHIARO, Individually, and on behalf of all others similarly situated (hereinafter, "Plaintiff") brings this Class Action Complaint against Defendant, THE METHODIST HOSPITALS, INC. (hereinafter "Methodist Hospitals" or "Defendant"), and alleges, upon personal knowledge as to his own actions, and upon information and belief as to all other matters, as follows.

### INTRODUCTION

1.     Plaintiff brings this class action to address Defendant's outrageous, illegal, and widespread practice of disclosing the confidential Personally Identifying Information[1] and/or

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

Protected Health Information[2] (collectively referred to as "Private Information") of Plaintiff and the proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook")[3] ("the Disclosure").

2.      The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible

---

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created, collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020). The Methodist Hospitals, Inc. is clearly a "covered entity" and some of the data compromised in the Data Breach that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiff's reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[5] Id.

disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition, impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[6]

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the United States Department of Health and Human Services ("HHS") has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider can disclose a person's personally identifiable protected health information to

---

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**

a third party without express written authorization.

5.    Methodist Hospitals is an Indiana healthcare system headquartered in Gary, Indiana, which holds itself out as "Northwest Indiana's leader in high-level, complex acute care [and] offers a full range of top-flight specialty care."[7]

6.    Despite its unique position as a trusted healthcare provider, Methodist Hospitals knowingly configured and implemented into its website, www.methodisthospitals.org (the "Website"), code-based devices known as "pixels" (also referred to as "trackers" or "tracking technologies"), which collected and transmitted patients' Private Information to Facebook and other third parties, without patients' knowledge or authorization.

7.    Defendant encourages its patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), which allow patients to locate physicians and treatment facilities, book medical appointments, communicate medical symptoms, search for medical conditions and treatment options, sign up for classes or events, and more.

8.    When Plaintiff and other Class Members used Defendant's Website, they thought they were communicating only with their trusted healthcare provider. Unbeknownst to them, Defendant has embedded the Facebook Meta Pixel (the "Pixel" or "Facebook Pixel" or "Meta Pixel") on its Website, surreptitiously forcing Plaintiff and Class Members to transmit to Facebook every click, keystroke, and intimate detail about their medical treatment. Operating as designed and as implemented by Defendant, the Pixel allows the Private Information that Plaintiff and Class Members submit to Defendant to be unlawfully disclosed to Facebook alongside the individual's unique and persistent Facebook ID ("FID").[8]

---

[7] *See* Methodist Hospitals website, https://methodisthospitals.org/services/; and https://methodisthospitals.org/locations/ (last accessed April 29, 2023).
[8] The Pixel forces the website user to share the user's FID for easy tracking via the "cookie"

9.    A pixel (also referred to as a "tracker" or "tracking technology") is a snippet of code embedded into a website that tracks information about its visitors and their website interactions.[9] When a person visits a website with an embedded pixel, the pixel tracks "events" (i.e., user interactions with the site), such as pages viewed, buttons clicked, and information submitted.[10] Then, the pixel transmits the event information back to the website server and to third parties, where it can be combined with other data and used for marketing.[11]

10.    Among the pixels Defendant embedded into its Website is the Facebook Pixel (also referred to as the "Meta Pixel" or "Pixel"). By default, the Meta Pixel tracks information about a visitor's device, including their IP address, and the pages viewed.[12] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[13] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[14]

---

Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited: January 27, 2023).

[9] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).

[10] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[11] Id.

[12] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).

[13] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).

[14] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser."

11.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiff and Class Members' Private Health Information alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

12.     Facebook encourages and recommends use of its Conversions Application Programming Interface ("CAPI") alongside use of the Meta Pixel.[15]

13.     Unlike the Facebook Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook in addition to the website owner, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interaction, including Private Information, records and stores that information on the website owner's servers, and then transmits the data to Facebook from the website owner's servers.[16,17]

14.     Indeed, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[18]

---

"Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

[15] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).

[16] https://revealbot.com/blog/facebook-conversions-api/ (last visited: January 24, 2023).

[17] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels.", https://developers.facebook.com/docs/marketing-api/conversions-api (last visited: January 27, 2023).

[18] https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last

1em

15.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Pixel from sending website users' Private Information to Facebook directly.

16.     Defendant utilized the Pixel and CAPI data for marketing purposes in an effort to bolster its profits. The Facebook Pixel and CAPI are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. Facebook also uses Plaintiff's and Class Members' Private Information to create targeted advertisements based on the medical conditions and other information disclosed to Defendant.

17.     The information that Defendant's Meta Pixel and CAPI sent to Facebook included the Private Information that Plaintiff and Class Members submitted to Defendant's Website, including for example, the contents of their search queries, the parameters of their doctor searches, the pages they visited, and the content they viewed.

18.     Such information allows a third party (e.g., Facebook) to know that a specific patient was seeking confidential medical care. Facebook, in turn, sells Plaintiff's and Class Members' Private Information to third-party marketers who geotarget Plaintiff's and Class Members' Facebook pages based on communications obtained via the Facebook Pixel and CAPI. Facebook and any third-party purchasers of Plaintiff's and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

19.     In addition to the Facebook tracker and CAPI, Defendant installed other tracking technology, including Google Analytics with Google Tag Manager. On information and belief,

---

visited Jan. 28, 2023).

this tracker operates similarly to the Meta Pixel and transmits a website user's Private Information to other Google.

20.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send personal health information or confidential medical information collected via its webpages to a hidden third party—let alone Facebook, which has a sordid history of privacy violations in pursuit of ever-increasing advertising revenue—without the patients' consent.

21.     Neither Plaintiff nor any other Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook, Google, or any other third party uninvolved in their treatment.

22.     Despite willfully and intentionally incorporating tracking technology, including the Meta Pixel, potentially CAPI, and other tracking technology, into its Website and servers, Methodist Hospitals has never disclosed to Plaintiff or Class Members that it shared their sensitive and confidential communications and Private Information with third parties including Facebook, Google, and possible others.

23.     Defendant further made expressed and implied promises to protect Plaintiff's and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant.

24.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiff's and Class Members' communications and medical information safe, secure, and confidential.

25.     Upon information and belief, Methodist Hospitals utilized Meta Pixel and Google Analytics data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

26.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiff's

and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard that information from unauthorized disclosure.

27.    Defendant breached its statutory and common law obligations to Plaintiff and Class Members by, *inter alia*,: (i) failing to adequately review its marketing programs and web based technology to ensure the hospital Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing, and conspiring with third-parties to intercept communications sent and received by Class Members; (iv) failing to obtain the written consent of Plaintiff and Class Members to disclose their Private Information to Facebook or others; (v) failing to take steps to block the transmission of Plaintiff's and Class Members' Private Information through Facebook Pixels; (vi) failing to warn Plaintiff and Class Members; and (vii) otherwise failing to design, and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

28.    Plaintiff seeks to remedy these harms and bring causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Invasion of Privacy, (IV) Breach of Implied Contract, (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty, and (VII) Violation of the Indiana Deceptive Consumer Sales Act, Indiana Code §§ 24-5-0.5-1 to -12.

29.    By this action, Plaintiff, on behalf of himself and the proposed Class Members, seeks relief of monetary damages including actual, compensatory, statutory, and punitive damages, statutory penalties, declaratory relief, as well as an order enjoining Methodist Hospital from engaging in the wrongful conduct complained of herein as to Defendant's misuse and/or disclosure of Plaintiff's and Class Members' Private Information and its refusal to issue prompt, complete and accurate disclosures to them as to its ongoing misconduct.

## PARTIES

30.     Plaintiff, Keith Chiaro, is a natural person and a resident and citizen of Indiana, where he intends to remain, with a principal residence in Schererville, Lake County, Indiana. He is a patient or former patient of Methodist Hospitals and a victim of Defendant's unauthorized disclosure of Personal Information via the Meta Pixel.

31.     Defendant, The Methodist Hospitals, Inc. ("Methodist Hospitals" or "Defendant") is a non-profit corporation organized and existing under the laws of the State of Indiana with its principal place of business in Gary, Indiana, in Lake County, at 600 Grant Street, Gary, Indiana 46402. Defendant's registered agent for service of process is Matthew Doyle, 600 Grant Street, Gary, Indiana 46402.

## COMMON FACTUAL ALLEGATIONS

### A. Background

32.     Methodist Hospitals, headquartered in Gary, Indiana renders  a wide range of medical, surgical, and mental health services to patients throughout northwestern Indiana, such as emergency medical treatment; obstetrics and gynecological care; surgical care, including outpatient surgeries, "robotic-assisted surgery" and advanced radiosurgical technology, advanced outpatient diagnostics, behavioral health services, breast care, diabetes treatment, heart and vascular care, home health services, maternal and infant care, digestive care, neuroscience, oncological treatment, orthopedic and spine treatment, otolaryngology; pharmaceutical services, plastic and reconstructive surgery, rehabilitation services, telehealth medical care, weight loss and bariatrics, and wound care. [19]

---

[19] *See* Services, Methodist Hospitals, https://methodisthospitals.org/services/ (last visited April 29, 2023); Locations, Methodist Hospitals, https://methodisthospitals.org/locations/ (last visited April 29, 2023).

33.    Defendant provides this medical care and treatment at approximately twenty-four (24) locations throughout northwest Indiana, in Gary, Merrillville, Crown Point, Schererville, Highland, and in Griffith in Lake County, and in Valparaiso in Porter County, specifically at:

- Midlake Campus, 2269 West 25th Ave., Gary, IN 46404;
- Northlake Campus, 600 Grant St., Gary, IN 46402;
- Southlake Campus, 8701 Broadway, Merrillville, IN 46410;
- Pavilion A, 101 E. 87th Ave., Merrillville, IN 46410;
- Pavilion B, 200 E. 89th Ave., Merrillville, IN 46410;
- Pavilion C, 8777 Broadway, Ste. B, Merrillville, IN 46410
- Pavilion D, 311 E. 89th Ave., Merrillville, IN 46410;
- Carefirst Immediate Care, 1275 E. North St., Crown Point, IN 46307;
- Carefirst Immediate Care, 751 E. 81st Ave., Merrillville, IN 46410
- Carefirst Immediate Care, 7860 Burr St., Schererville, IN 46375;
- Carefirst Imaging Center, 7860 Burr St.. Schererville, IN 46375;
- Physician Clinic (Family Medicine), 650 Grant St., Ste. 6, Gary, IN 46402;
- Physician Clinic (General Surgery), 650 Grant St., Ste. 5, Gary, IN 46402;
- Physician Clinic (Internal Medicine), 6101 Miller Ave., Gary, IN 46403;
- Physician Clinic (Cardiology), 5800 Broadway, Merrillville, IN 46410;
- Physician Clinic (Internal Medicine), 3195 Broadway, Gary, IN 46409;
- Physician Clinic (Podiatry), 9105a Indianapolis Blvd., Highland, IN 46322;
- Physician Clinic (Family Medicine, Ob/Gyn), 751 E. 81st Pl., Merrillville, IN 46410
- Physician Clinic (ENT), 101 E. 87th Ave., Suite 400, Merrillville, IN 46410;
- Physician Clinic (Ob/Gyn), 2200 Grant St., #207, Gary, IN 46404;
- Physician Clinic (Cardiac Electrophysiology), 200 E. 89th Ave., Ste. 3c, Merrillville, IN 46410;
- Physician Clinic (Cardiology), 200 E. 89th Ave., Ste. 3b, Merrillville, IN 46410;
- Physician Clinic (Cardiology), 1212 N. Broad St., Griffith, IN 46319; and,
- Carefirst Immediate Care, 1781 W. Morthland Drive, Valparaiso, IN 46385.[20]

34.    Methodist Hospitals serves many of its patients via its Website and Online Platforms, which it encourages them to use for finding medical providers, scheduling appointments and/or procedures, communicating with their healthcare providers, reviewing their medical

---

[20] *See id.,* https://methodisthospitals.org/locations/ (last visited April 29, 2023).

histories and related documents, and communicating other information related to their treatment and status as a patient. It promotes the comprehensive functionality of these tools and promotes their use, in service of its own goal of increasing profitability.

35.    In furtherance of that goal, Defendant purposely installed the Meta Pixel and other trackers onto its Website, for the purpose of gathering information about Plaintiff and Class Members to further its marketing efforts. But Defendant did not only generate information for its own use: it also shared patient information, including Private Information belonging to Plaintiff and Class Members, with Facebook and other unauthorized third parties.

36.    To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows:

### i. Facebook's Business Tools and the Meta Pixel

37.    As Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[21]

38.    In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendant, to utilizes its "Business Tools" to gather, identify, target, and market products and services to individuals.

39.    Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

40.    The Business Tools are automatically configured to capture "Standard Events" such

---

[21] Facebook, *Meta Reports Fourth Quarter and Full Year 2021 Results* , https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).

as when a user visits a particular webpage, the webpage's Universal Resource Locator ("URL"), as well as metadata, button clicks, and other information.[22] Businesses that want to target customers and advertise their services, such as Defendant, can track other user actions and can create their own tracking parameters by building a "custom event."[23]

41.      One such Business Tool is the Pixel that "tracks the people and type of actions they take."[24] When a user accesses a webpage that is hosting the Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling from the user's browser to Facebook's server.

42.      Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate privacy (such as the homepage) and disable it on pages that do implicate patient privacy (such as Defendant's "Physician Search" page). Thus, Plaintiff's and Class Member's Private Information would not have been disclosed to Facebook via the Pixel but for Defendant's decisions to install the Pixel on its Website and specifically on the webpages that solicit and receive Private Information.

43.      The Meta Pixel's primary purpose is for marketing and ad targeting and sales

---

[22] Facebook, *Specifications for Facebook Pixel Standard Events,* https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last visited Jan. 31, 2023); *see* Facebook, *Facebook Pixel, Accurate Event Tracking, Advanced*, https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Facebook, *Best Practices for Facebook Pixel Setup*, https://www.facebook.com/business/help/218844828315224?id=1205376682832142; Facebook, *App Events API*, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).
[23] Facebook, *About Standard and Custom Website Events*, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* Facebook, *App Events API*, *supra*.
[24] Facebook, *Retargeting*, https://www.facebook.com/business/goals/retargeting.

generation.[25]

44.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[26]

45.    According to Facebook, the Meta Pixel can collect the following data:

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** (emphasis added).
**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[27]

46.    Meta boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[28]

---

[25] *See* Meta Pixel, META FOR DEVELOPERS https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[26] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).
[27] Meta Pixel, META FOR DEVELOPERS https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[28] About Meta Pixel, Meta Business Help Center.

47.    Facebook likewise benefits from the data received from the Pixel and uses the data to serve targeted ads and identify users to be included in such targeted ads.

***ii. Defendant's method of transmitting Plaintiff's and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Pixel***

48.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

49.    Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

50.    Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[29]

51.    GET Requests are one of the most common types of HTTP Requests. In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

52.    When an individual visits a website, their web browser sends an HTTP Request to

---

https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last accessed Mar. 19, 2023).

[29] "Cookies are small files of information that a web server generates and sends to a web browser. …Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

the entity's servers that essentially asks the website to retrieve certain information (such as Defendant's "Physician Search" page). The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

53.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

54.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user, and this is exactly what happened when patients used Defendant's Website and Online Platforms.

55.     Defendant's implementation of the Pixel is source code that acted much like a traditional wiretap, intercepting and transmitting communications intended only for Defendant.

56.     Separate from the Pixel, Facebook and other website owners can place third-party cookies in the web browsers of users logged into their websites or services. These cookies can uniquely identify the user so the cookie owner can track the user as she moves around the internet—whether on the cookie owner's website or not. Facebook uses this type of third-party cookie when Facebook account holders use the Facebook app or website. As a result, when a Facebook account holder uses Defendant's Website, a unique id is sent to Facebook along with the intercepted communication that allows Facebook to identify the patient associated with the Private Information it has intercepted.

57.     With substantial work and technical know-how, internet users can sometimes

circumvent this browser-based wiretap technology. To counteract this, third parties bent on gathering data and Private Information implement workarounds that are difficult to detect or evade. Facebook's workaround is its Conversions API tool, which is particularly effective because the data transmitted via this tool does not rely on the website visitor's web browsers. Rather, the information travels directly from Defendant's server to Facebook's server.

58.    Conversions API "is designed to create a direct connection between [Web hosts'] marketing data and [Facebook]." Thus, Defendant receives and stores its communications with patients on its server before Conversions API collects and sends those communications—and the Private Information contained therein—to Facebook.

59.    Notably, client devices do not have access to host servers and thus cannot prevent (or even detect) this additional transmission of information to Facebook.

60.    While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the host server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendant "to share website events [with Facebook] that the pixel may lose."[30]  Thus, since Defendant implemented the Pixel in in accordance with Facebook's documentation, it is also reasonable to infer that Defendant implemented the Conversions API tool on its website.

61.    The third parties to whom a website transmits data through pixels and other tracking technologies do not provide any substantive content on the host website. In other words, Facebook and others like it are not providing anything to the user relating to the user's communications.

---

[30] *See* https://www.facebook.com/business/help/308855623839366?id= 818859032317965 (last visited Jan. 23, 2023).

Instead, these third parties are typically procured to track user data and communications only to serve the marketing purposes of the website owner (*i.e.,* to bolster profits).

62.    Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its source code to commandeer its patients' computing devices, causing the device's web browser to contemporaneously and invisibly re-direct the patients' communications to hidden third parties like Facebook.

63.    In this case, Defendant employed the Meta Pixel and Conversions API to intercept, duplicate, and re-direct Plaintiff's and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

64.    Consequently, when Plaintiff and Class Members visited Defendant's website and communicated their Private Information, including, but not limited to, medical treatment sought, medical conditions, physician selected, specific button/menu selections, and content (such as searches for symptoms or treatment options) typed into free text boxes, is simultaneously intercepted and transmitted to Facebook.

65.    Methodist Hospitals also employed other trackers, including Google Analytics with Google Tag Manager and Facebook Events, which, on information and belief, likewise transmitted Plaintiff's and the Class Members' Private Information to third parties without Plaintiff's and Class Members' knowledge or authorization.

### iii. Defendant Violated its own Privacy Policies

66.    Methodist Hospitals maintains a Notice of Privacy Practices, stating "THIS NOTICE DESCRIBES HOW HEALTH INFORMATION ABOUT YOU MAY BE USED AND DISCLOSED AND HOW YOU CAN GET ACCESS TO THIS INFORMATION. PLEASE

REVIEW IT CAREFULLY."[31]

67.    Defendant's Notice of Privacy Practices must be followed by:

- Any health care professional authorized to enter information into your health record.
- All service areas of the Hospital.
- Any member of a volunteer group we allow to help you while you are in the Hospital.
- All employees, staff and other Hospital personnel, including doctors on staff.
- When this Notice refers to "we" or "us," it is referring to The Methodist Hospitals, Inc.[32]

68.    Defendant's Notice of Privacy Practices states it "will tell you about the ways in which we may use and disclose health information about you. We also describe your rights and certain obligations we have regarding the use and disclosure of health information."[33]

69.    Therein, Methodist Hospitals acknowledges, represents and promises patients that it "is required by law to: • Make sure that health information that identifies you is kept private; • Present and make available to you this Notice of our legal duties and privacy practice's with respect to health information about you; and • Follow the terms of the Notice currently in effect."[34]

70.    Methodist Hospitals' Notice of Privacy Practices enumerates certain purposes for which it may disclose health information, and states:

OTHER RIGHTS REGARDING YOUR CONFIDENTIAL HEALTH INFORMATION:

**Other uses and disclosures of health information not covered by this Notice or the laws that apply to us will be made only with your written authorization.** If you provide us authorization to use or disclose health information about you, you may revoke that authorization, in writing, at any time. If you revoke your authorization, we will no longer use or disclose health information about you for the reasons covered by your written authorization. You understand that we are

---

[31] *Id.* (all capitals in original).

[32] *See* Methodist Hospital's Notice of Privacy Practices, available at https://methodisthospitals.org/wp-content/uploads/2023/04/MH-Privacy-Policy.pdf (last accessed April 29, 2023), **attached as Exhibit B.**

[33] *Id.*

[34] *Id.*

unable to take back any disclosures we have already made with your authorization, and that we are required to retain our records of the care that we provide to you. Specific disclosure requiring a signed authorization are as follows: […][35]

71.    The above section of Defendant's Notice of Privacy Practices goes on to say:

MARKETING PURPOSES: Requires a signed authorization by the patient or patient representative with the following **exceptions**:

A covered entity must obtain an authorization for any use or disclosure of protected health information for marketing, except if the communication is in the form of:

A face-to-face communication made by a covered entity to an individual; or

A promotional gift of nominal value provided by the covered entity[36]

72.    Defendant's Notice of Privacy Practices does not permit Defendant to use and disclose Plaintiff's and Class Members' Private Information for marketing purposes without written permission.[37]

73.    Defendant violated its own Notice of Privacy Practices by unlawfully disclosing Plaintiff's and Class Members' Private Information to Facebook, Meta, Google, and likely other third parties.

74.    On information and belief, Methodist Hospitals, does not maintain a separate online privacy policy which is accessible to the public, although a hyperlink https://methodisthospitals.org/privacy-policy-2/, may exist for the same, but is blank other than displaying the words, "Privacy Policy," as shown below.[38]

---

[35] *Id.* (bold emphasis added).
[36] *Id.*
[37] *Id.*
[38] https://methodisthospitals.org/privacy-policy-2/ (last visited Apr. 29, 2023).



75.     However, Methodist Hospitals does maintain Patient Rights & Responsibilities[39] which represents that Defendant, "…respect[s] and value[s] the privacy and personal dignity of [its] patients, and support patients' rights to receive considerate, respectful care regardless of race, spiritual, cultural or personal beliefs, gender, or any other status as protected by law."[40]

76.     Defendant's Patient Rights & Responsibilities further affords patients, including Plaintiff and the Class Members, the rights to, *inter alia*:

- Personal privacy.
- Confidentiality of his or her clinical records/personal health information.
- Access, request amendment to, and/or obtain information on disclosures of his or her health information, in accordance with law and regulation.
- Receive information, about the individual(s) responsible for, as well as those providing his or her care, treatment, and services. This includes provider's name and professional status.
- …be free from all forms of abuse or harassment; neglect; or exploitation; to include verbal, mental, physical, and sexual abuse. [and to]
- Be free from retaliation and humiliation.[41]

---

[39] *See* https://methodisthospitals.org/patient/patient-rights/ (last acc. Apr. 30, 2023), **attached as Exhibit C.**
[40] *Id.*
[41] *Id.*

77.    Moreover, in the Patient Rights and Responsibilities, Defendant requires that its patients, including Plaintiff and the Class Members, *inter alia*:

- Provide information that facilitates the patients [*sic*] care, treatment, and services.
- Keep their appointments, be on time, and call their health care provider as soon as possible if you cannot keep your scheduled appointment.
- Provide complete and accurate information about their health insurance coverage and/or any changes to it…
- Openly report concerns about quality of care, fraud, and/or abuse.
- Let their provider know about any changes to their contact information, including their full name, home address, phone number, date of birth, social security number, insurance information, and employer.
- Provide, to the best of their knowledge, complete and accurate information on their health history, past illnesses, hospitalizations, medications, and other matters related to their health status in order to give the best possible care [and]
- Ask for additional information or explanation about their health status or treatment when they do not fully understand information and instructions.[42]

78.    Defendant unlawfully disclosed Plaintiff's and Class Members' Private Information to Facebook, Meta, and likely other third parties, without authorization, in violation its own Notice of Privacy Practices and its Patient Rights and Responsibilities, despite requiring this information as a condition of providing care and treatment.

79.    Defendant further misrepresented that it would preserve the confidentiality of their Private Information and the anonymity of their identities.

80.    Despite the representations in its privacy policies, Methodist Hospitals does indeed transfer PII and PHI, Private Information, to third parties. Defendant installed the Meta Pixel and configured it to track patients as they navigate through its Website, to record the pages they visited, the content they viewed, and the terms they searched and to transmit the recorded information to Facebook. For example, when patients navigate to the Defendant's "Oncology Institute" page, and

---

[42] *Id.*

then click on "Prostate Cancer Program," Defendant's Meta Pixel tracks the visit and sends the URL to Facebook, along with the health information embedded therein (e.g. "oncology-institute/prostate-cancer-program/") and a unique identification number that Facebook has assigned to the individual browsing the site.

81.    Similarly, Methodist Hospitals discloses when users view a class on their Website. For instance, when a patient clicks on "Parkinson's Patients Yoga Class," Defendant has configured its Meta Pixel to send the name and date of the class to Facebook—again, alongside a Facebook-generated identification number assigned to the individual browsing the page.

82.    Additionally, Methodist Hospitals likely disclosed to Facebook patients' search queries, entered by patients into the Website's main search bar and into the "Physician Search" tool. For instance, when a patient searches "covid" on the Website's general search, Defendant's Meta Pixel sends to Facebook the URL of the patient's search results, which includes the information sought by the patient (e.g., "s=covid). Similarly, when a patient uses the "Physician Search" to find a "Maternal-Fetal Medicine" specialist, these parameters are also disclosed to Facebook (i.e., "specialty=maternal-fetal-medicine" and "type=physician"). If a patient searches for a physician by name, that information, too, is disclosed to Facebook. (For example, if a user searched for "Leonard Feinkind," Facebook receives the information as "s=Leonard+Feinkind.").

83.    After collecting and intercepting this information, Facebook processes it, analyzes it, and assimilates it into datasets like Core Audiences and Custom Audiences.

84.    Google and other companies likewise process this data in a similar manner and use it to connect the information to particular individuals to build marketing and other data profiles.

85.    Defendant used and disclosed Plaintiff's and Class Members' Private Information to Facebook, Google, and possibly other third parties for the purpose of marketing its services and

increasing its profits.

86.    On information and belief, Defendants shared, traded, or sold Plaintiff's and Class Members' Private Information with Facebook, and potentially other third parties, in exchange for improved targeting and marketing services.

87.    Defendant could have chose not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to third parties, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.

88.    Along those same lines, Defendant could have chosen not to use Google Analytics with Google Tag Manager and/or other tracking technologies to track Plaintiff and Class Members private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers despite the harm to Plaintiff and Class Members' privacy.

89.    Plaintiff and the proposed Class Members never consented, agreed, authorized, or otherwise permitted Defendant Methodist Hospitals to disclose their Private Information and assist with intercepting their communications. Plaintiff and the Class Members were never provided with any written notice that Defendant discloses its patients' protected health information, nor were they provided any means of opting out of such disclosures. Defendant nonetheless knowingly disclosed Plaintiff's protected health information to Meta, Google, and possible other unauthorized entities.

90.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare

purposes only, and to make only authorized disclosures of this information.

91.     By law, Plaintiff is entitled to privacy in his protected health information and confidential communications. Methodist Hospitals deprived Plaintiff and Class Members of their privacy rights when it: (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiff's and Class Members' confidential communications, personally identifiable information, and protected health information; (2) disclosed patients' protected information to Facebook and others—unauthorized third-party eavesdroppers; and (3) undertook this pattern of conduct without notifying Plaintiff and Class Members and without obtaining their express written consent. Plaintiff did not discover that Methodist Hospitals disclosed his personally identifiable information and protected health information, Private Information, to Facebook and Google, and assisted Facebook and Google with intercepting their communications.

**B. Plaintiff's Experience**

92.     Plaintiff Keith Chiaro was a patient of Defendant beginning in 2017 and received healthcare services from one of the hospitals and physicians in Methodist Hospitals' network and relied on Methodist Hospitals' Website and Online Platforms to communicate confidential patient information.

93.     Specifically, in 2017, Plaintiff received emergency department medical treatment at Methodist Hospitals' facility for injuries received in an automobile collision. Thereafter, he also received care and treatment from Defendant for sepsis and physical rehabilitation therapy.

94.     Plaintiff accessed Defendant's Website and Online Platforms in order to receive healthcare services from Defendant and at Defendant's direction and encouragement. Plaintiff used the Website to access the Methodist Hospitals' patient portal to obtain diagnostic test results

and to pay bills. Plaintiff reasonably expected that his online communications with Methodist Hospitals were confidential, solely between himself and Methodist Hospitals, and that such communications would not be transmitted to or intercepted by a third party.

95.     Plaintiff provided his Private Information to Defendant and trusted that the information would be safeguarded according to Methodist Hospitals' privacy policies and state and federal law.

96.     As described herein, Methodist Hospitals sent Plaintiff's Private Information to Facebook, Google, and others when he used Defendant's digital platforms to communicate healthcare and identifying information to Methodist Hospitals.

97.     Pursuant to the process described herein, Methodist Hospitals assisted Facebook, Google, and others with intercepting Plaintiff John Doe's communications, including those that contained PII, PHI, Private Information, and related confidential information. Methodist Hospitals facilitated these interceptions without Plaintiff's knowledge, consent, or express written authorization.

98.     By failing to receive the requisite consent, Methodist Hospitals breached confidentiality and unlawfully disclosed Plaintiff's Private Information, PII and PHI.

**C.     Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

99.     In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[43] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

---

[43] https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

100.     On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data. The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway. The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on this issue have been very limited and were not effective … at preventing the receipt of sensitive data."[44]

101.     The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data is not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling: the company was sharing their data with Facebook.[45] When a user was having her period or informed the app of her intention to get pregnant, Flo would tell Facebook, which could then use the data for all kinds of activities including targeted advertising. In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[46]

102.     More recently, Facebook employees admitted to lax protections for sensitive user data. Facebook engineers on the ad business product team conceded in a 2021 privacy review that

---

[44] https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[45] https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[46] https://slate.com/technology/2022/06/health-data-brokers-privacy.html.

"We do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[47]

103.    Furthermore, in June 2022, an investigation by The Markup[48] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[49] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[50] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[51]

104.    The Markup article found during the course of its investigation that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included details such as patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also included patients' names, addresses, email addresses, and phone numbers.[52]

---

[47] https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

[48] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed Mar. 19, 2023).

[49] PIXEL HUNT, *Facebook Is Receiving Sensitive Medical Information from Hospital Websites*, https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites (last accessed Mar. 19, 2023).

[50] *Id.*

[51] *Id.*

[52] *Id.*

105.     Despite knowing that the Meta Pixel code embedded in its websites was sending patients' personal health information to Facebook, Defendant did nothing to protect its patients from egregious intrusions into its patients' privacy, choosing instead to benefit at those patients' expense.

106.     In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the pixels inside their password-protected patient portals.[53]

107.     David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply troubled" by what the hospitals were doing by capturing patient data and sharing it.[54]

### D.    Defendant Violated HIPAA Standards

108.     Under Indiana law and HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[55]

109.     Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

110.     In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to

---

[53] *Id.*
[54] *Id.*
[55] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[56]

111.    In its guidance for Marketing, the Department further instructs:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis added).[57]

112.    In addition, the Office for Civil Rights (OCR) at the U.S. Department of Health and Human Services (HHS) has issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies ("tracking technologies").[58]

113.    According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[59]

114.    Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies**

---

[56] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf (last visited Nov. 3, 2022).
[57] https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf  (last visited Nov. 3, 2022)
[58] *See* https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[59] *Id.*

**in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [60]

115.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Facebook Pixel is a violation of HIPAA Rules.

## E.    Defendant Violated FTC Standards, and the FTC and HSS Take Action

116.    The FTC has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[61]

117.    On July 20, 2023, the Federal Trade Commission (FTC) along with the U.S. Department of Health and Human Services (HHS) sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online

---

[60] *Id.* (emphasis in original) (internal citations omitted).
[61] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**

activities."[62]

118.    Therein, the FTC reminded healthcare providers of their HIPAA obligations: "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules."[63]

119.    Additionally, the FTC reminded health providers of their "obligation to protect against impermissible disclosures of personal health information," adding that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you do not use the information obtained through use of a tracking technology for any marketing purposes."[64]

120.    Entities that are not covered by HIPAA also face accountability when consumers' sensitive health information is compromised under the FTC's Health Breach Notification Rule. 16 C.F.R. § 318. This requires that companies dealing with health records must notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, including sharing of covered information without an individual's authorization, triggers notification obligations under the Rule."[65]

---

[62] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[63] *Id.*
[64] *Id.*
[65] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf).

121.    The FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a).

122.    According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[66]

123.    In other words, the FTC and OCR have expressly stated that Defendant's conduct of implementing the Facebook Pixel is a likely violation of the FTC Act and/or the FTC's Health Breach Notification Rule.

**F.    Defendant Violated Industry Standards**

124.    A medical provider's duty of confidentiality is a cardinal rule and is embedded in the physician-patient and hospital-patient relationship.

125.    The American Medical Association's ("AMA") Code of Medical Ethics contains numerous rules protecting the privacy of patient data and communications, which are applicable to Methodist Hospitals and its physicians.

126.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care… Patient privacy encompasses a number of aspects, including, … personal data (informational privacy).

---

[66] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

127.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (A) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

128.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically…must…:(c ) release patient information only in keeping ethics guidelines for confidentiality.

## G.    Plaintiff's and Class Members' Expectation of Privacy

129.    At all times when Plaintiff and Class Members provided their Private Information to Defendant, they all had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial purpose, unrelated to patient care.

## H.    IP Addresses are Personally Identifiable Information

130.    On information and belief, through the use of the Facebook Pixel on Defendant's Website, Defendant also disclosed and otherwise assisted Facebook with intercepting Plaintiff's and Class Members' Computer IP addresses.

131.    An IP address is a number that identifies the address of a device connected to the Internet.

132.    IP addresses are used to identify and route communications on the Internet.

133.    IP addresses of individual Internet users are used by Internet service providers,

34

Websites, and third-party tracking companies to facilitate and track Internet communications.

134.    Facebook tracks every IP address ever associated with a Facebook user.

135.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

136.    Under HIPAA, an IP address is considered personally identifiable information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code" and specifically lists the example of IP addresses.  See 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

137.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**I.    Defendant Was Enriched and Benefitted from the Use of The Pixel and Unauthorized Disclosures**

138.    The sole purpose of the use of the Facebook Pixel on Defendant's Website was marketing and profits.

139.    In exchange for disclosing the Private Information of its patients, Defendant is compensated by Facebook in the form of enhanced advertising services and more cost-efficient marketing on its platform.

140.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

141.    By utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby benefitting Defendant.

**J.    Plaintiff's and Class Members' Private Information Had Financial Value**

142.    Plaintiff's data and Private Information has economic value. Facebook regularly uses data that it acquires to create Core and Custom Audiences, as well as Lookalike Audiences and then sells that information to advertising clients.

143.    Data harvesting is one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

144.    The value of health data in particular is well-known, and has been reported on extensively in the media. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[67]

145.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[68]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

146.    The applicable statutes of limitation have been tolled as a result of Methodist Hospitals's knowing and active concealment and denial of the facts alleged herein.

147.    Methodist Hospitals seamlessly incorporated Meta Pixel and other trackers into its

---

[67] *See* https://time.com/4588104/medical-data-industry/ (last visited February 16, 2023).
[68] *See* https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited February 16, 2023).

Website and Online Platforms while providing users with no indication that their Website usage was being tracked and transmitted to third parties. Methodist Hospitals knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiff and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, and likely other third parties, including Google, Microsoft, AppNexus, Hotjar, Arttrk.com, and Trade Desk.

148.    Plaintiff and Class Members could not with due diligence have discovered the full scope of Methodist Hospitals' conduct, because there were no disclosures or other indication that they were interacting with websites employing Meta Pixel or any other tracking technology.

149.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Methodist Hospitals' illegal interception and disclosure of Plaintiff's Private Information has continued unabated through the present. What's more, Methodist Hospitals was under a duty to disclose the nature and significance of their data collection practices but did not do so. Methodist Hospitals is therefore estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

150.    Plaintiff brings this statewide class action on behalf of himself and on behalf of other similarly situated persons.

151.    The Statewide Class that Plaintiff seek to represent is defined as follows:

**All Indiana citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

152.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which

Defendant has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; any and all federal, state or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

153.    Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

154.    **Numerosity:** Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly accessed in the Disclosure, and each Class is apparently identifiable within Defendant's records.

155.    **Commonality:** Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include:

  a.    Whether and to what extent Defendant had a duty to protect Plaintiff's and Class Members' Private Information;

  b.    Whether Defendant had duties not to disclose the Plaintiff's and Class Members' Private Information to unauthorized third parties;

  c.    Whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for non-healthcare purposes;

  d.    Whether Defendant had duties not to use Plaintiff's and Class Members' Private Information for unauthorized purposes;

  e.    Whether Defendant failed to adequately safeguard Plaintiff's and Class Members' Private Information;

38

    f.      Whether and when Defendant actually learned of the Disclosure;

    g.      Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

    h.      Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their Private Information had been compromised;

    i.      Whether Defendant failed to properly implement and configure the tracking software on its digital platforms to prevent the disclosure of information compromised in the Disclosure;

    j.      Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Disclosure to occur;

    k.      Whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiff's and Class Members' Private Information.

156. **Typicality:** Plaintiff's claims are typical of those of other Class Members because all had their Private Information compromised as a result of the Disclosure, due to Defendant's use and incorporation of the tracking software.

157. **Policies Generally Applicable to the Class:** This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenge of these policies hinges on Defendant's conduct with

respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

158.    **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that Plaintiff have no disabling conflicts of interest that would be antagonistic to those of the other Members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the Members of the Class and the infringement of the rights and the damages Plaintiff have suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intend to prosecute this action vigorously.

159.    **Superiority and Manageability:** Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

160.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered;

proof of a common course of conduct to which Plaintiff were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

161.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

162.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

163.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful disclosure and failure to properly secure the Private Information of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Disclosure, and Defendant may continue to act unlawfully as set forth in this Complaint.

164.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class and, accordingly, final injunctive or corresponding declaratory relief with regard to the Class Members as a whole is appropriate.

165.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

> a.    Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.    Whether Defendant breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.    Whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.    Whether an implied contract existed between Defendant on the one hand, and Plaintiff and Class Members on the other, and the terms of that implied contract;

e.    Whether Defendant breached the implied contract;

f.    Whether Defendant adequately and accurately informed Plaintiff and Class Members that their Private Information had been compromised;

g.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Disclosure;

h.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiff's and Class Members' Private Information;

i.    Whether Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

**COUNT I**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class)**

166.    Plaintiff re-alleges and incorporates the above allegations as if fully set forth herein.

167.    Defendant owed to Plaintiff and Class Members a duty to exercise reasonable care in handling and using Plaintiff's and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

168.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiff's and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

169.    Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiff's and Class Members' Private Information.

170.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiff and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

171.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and Private Information of Plaintiff and Class Members. This failure actually and proximately caused Plaintiff's and Class Members' injuries.

172.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary

damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

173.    Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff's and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, lost value of their Private Information, and lost time and money incurred to mitigate and remediate the effects of use of their information that resulted from and were caused by Defendant's negligence. These injuries are ongoing, imminent, immediate, and continuing.

**COUNT II**
**NEGLIGENCE *PER SE***
**(On Behalf of Plaintiff and the Class)**

174.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

175.    Plaintiff alleges this negligence *per se* theory as alternative to his other negligence claim.

176.    Pursuant to the laws set forth herein, including 10A N.C. Admin. Code § 13B.3302(3), the FTC Act, HIPAA, the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiff's and Class Members'

44

Private Information.

177.    Plaintiff and Class Members are within the class of persons that these statutes and rules were designed to protect.

178.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiff's and Class Members' PII and PHI.

179.    Defendant owed a duty to timely and adequately inform Plaintiff and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

180.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiff's and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third-party such as Facebook gaining access to Plaintiff's and Class Members' PII and PHI, resulting in Defendant's liability under principles of negligence per se.

181.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiff's and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

182.    Plaintiff's and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and damages to Plaintiff and Class Members.

183.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiff and Class Members to, inter alia, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and

worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

184.    In failing to secure Plaintiff's and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiff's and Class Members' rights. Plaintiff, in addition to seeking actual damages, also seeks punitive damages on behalf of herself and the Class.

**185.**    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiff's and Class Members' PII and PHI, and as a result, Plaintiff and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiff and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

### COUNT III
### INVASION OF PRIVACY
### (On Behalf of Plaintiff and the Class)

186.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

187.    Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

188.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendant via its website and the communications platforms, Online Platforms, and services therein.

189.    Plaintiff and Class Members communicated sensitive PHI and PII, Private

Information, that they intended for only Defendant to receive and that they understood Defendant would keep private.

190.    Defendant's disclosure of the substance and nature of those communications to third parties without the knowledge and consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

191.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendant's representations, Notice of Privacy Practices, Patient Rights and Responsibilities, and HIPAA. Moreover, Plaintiff and Class Members have a general expectation that their communications regarding healthcare with their healthcare providers will be kept confidential. Defendant's disclosure of PHI coupled with PII is highly offensive to the reasonable person.

192.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including but not limited to an invasion of their privacy rights.

193.    Plaintiff and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

194.    Plaintiff and Class Members seek appropriate relief for that injury, including but not limited to damages that will reasonably compensate Plaintiff and Class Members for the harm to their privacy interests as a result of its intrusions upon Plaintiff's and Class Members' privacy.

195.    Plaintiff and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, directed at injuring Plaintiff and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

196.    Plaintiff also seeks such other relief as the Court may deem just and proper.

**COUNT IV**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiff and the Class)**

197.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

198.    As a condition of utilizing Defendant's digital platforms, Online Platforms, and receiving services from Defendant, Plaintiff and the Class provided their Private Information and compensation for their medical care. In so doing, Plaintiff and the Class entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Notice of Privacy Practices, Patient Rights and Responsibilities, and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

199.    Implicit in the agreement between Methodist Hospitals and its patients was the obligation that both parties would maintain the Private Information confidentially and securely.

200.    Methodist Hospitals had an implied duty of good faith to ensure that the Private Information of Plaintiff and Class Members in its possession was only used only as authorized, such as to provide medical treatment, billing, and other medical benefits from Methodist Hospitals.

201.    Methodist Hospitals had an implied duty to protect the Private Information of Plaintiff and Class Members from unauthorized disclosure or uses.

202.    Additionally, Methodist Hospitals implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

203.    Plaintiff and Class Members fully performed their obligations under the implied contract with Methodist Hospitals. Methodist Hospitals did not. Plaintiff and Class Members would not have provided their confidential Private Information to Methodist Hospitals in the

48

absence of their implied contracts with Methodist Hospitals and would have instead retained the opportunity to control their Private Information for uses other than medical treatment, billing, and benefits from Methodist Hospitals.

204.    Methodist Hospitals breached the implied contracts with Plaintiff and Class members by disclosing Plaintiff's and Class Members' Private Information to an unauthorized third party.

205.    Methodist Hospitals' acts and omissions have materially affected the intended purpose of the implied contracts requiring Plaintiff and Class Members to provide their Personal Information in exchange for medical treatment and benefits.

206.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

207.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and the Class are entitled to recover actual, consequential, and nominal damages.

### COUNT V
### UNJUST ENRICHMENT
### (On Behalf of Plaintiff and the Class)

208.    Plaintiff re-alleges and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

209.    This claim is pleaded solely in the alternative to Plaintiff's breach of contract claim.

210.    Plaintiff and Class members conferred a monetary benefit upon Methodist Hospitals in the form of valuable sensitive medical information that Defendant collected from Plaintiff and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement

purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiff and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

211.    Plaintiff and Class Members would not have used Methodist Hospitals' services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose this information to third parties.

212.    Methodist Hospitals appreciated or had knowledge of the benefits conferred upon it by Plaintiff and Class members.

213.    As a result of Methodist Hospitals' conduct, Plaintiff and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiff and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

214.    The benefits that Defendant derived from Plaintiff and Class Members rightly belong to Plaintiff and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

215.    Methodist Hospitals should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Disclosure alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiff and the Class)**

216.    Plaintiff re-alleges and incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

217.    A relationship existed between Plaintiff and the Class on the one hand and Defendant on the other in which Plaintiff and the Class put their trust in Methodist Hospitals to protect the Private Information of Plaintiff and the Class and Methodist Hospitals accepted that trust.

218.    Defendant Methodist Hospitals breached the fiduciary duties that it owed to Plaintiff and the Class Members by failing to act with the utmost good faith, fairness, and honesty, failing to act with the highest and finest loyalty, and failing to protect, and intentionally disclosing, the Private Information of Plaintiff and the Class.

219.    Defendant's breach of fiduciary duty was a legal cause of damage to Plaintiff and the Class.

220.    But for Defendant's breach of fiduciary duty, the damage to Plaintiff and the Class would not have occurred.

221.    Defendant's breach of fiduciary duty contributed substantially to producing the damage to the Plaintiff and the Class.

222.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiff and Class Members are entitled to and do demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**COUNT VII**
**VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT**
**(On Behalf of Plaintiff and the Classes)**

223.    Plaintiff realleges and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

224.    The purposes and policies of the Indiana Deceptive Consumer Sales Act (the "DCSA"), Indiana Code § 24-5-0.5-1 to -12, are to:

      (1)     simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;

      (2)     protect consumers from suppliers who commit deceptive and unconscionable consumer sales practices; and

      (3)     encourage the development of fair consumer sales practice.

Ind. Code § 24-5-0.5-1(b).

225.    The General Assembly has instructed courts to construe the DCSA liberally to promote these purposes and policies. Ind. Code § 24-5-0.5-1(a)

226.    Methodist Hospitals is a "supplier" as defined in the DCSA because it is a seller or other person who regularly engages in or solicits consumer transactions, which are defined to include sales of personal property, *services*, and intangibles that are primarily for a personal, familial, or household purpose, such as those at issue in this action. Ind. Code § 24-5-0.5-2(1), (3) (emphasis added).

227.    The DCSA provides that "[a] supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of [the DCSA] whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

228.    An "incurable deceptive act" is a "deceptive act done by a supplier as part of a scheme, artifice, or device with the intent to defraud or mislead. Ind. Code § 24-5-0.5-2(a)(8).

229.    The DCSA further provides:

Without limiting the scope of subsection (a) the following acts, and the following representations as to the subject matter of a consumer transaction, made orally, in writing, or by electronic communication, by a supplier, are deceptive acts:

      a.     That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have

      b.     That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not…

Ind. Code § 24-5-0.5-3

230.    Methodist Hospitals committed deceptive acts, including but not limited to:

    a.     Encouraging patients to use Methodist Hospitals' Website and Online Platforms while representing to patients that it is committed to protecting the privacy of the Personal Information patients provide. Defendant also promised patients that it will never sell their medical information without patients' written authorization.

    b.     Despite these representations, Methodist Hospitals disclosed information relating to Plaintiff's and Class Members' medical treatment to third parties without their knowledge, consent or authorization as part of a scheme, artifice or device with the intent to mislead patients.

    c.     Plaintiff and Class Members relied on Methodist Hospitals' representations in using Methodist Hospitals' Online Platform and thought they were communicating only with their trusted healthcare provider.

    d.     By installing and implementing the Meta Pixel, Defendant knew or reasonably should have known it intercepted and transmitted Plaintiff's and Class Member's communications from Plaintiff's and Class Members' browsers directly to Facebook. Likewise, by installing or implementing CAPI, Defendant knew or reasonably should have known that it recorded on its servers and transmitted to Facebook Plaintiff's and Class Member's confidential communications.

231.    Methodist Hospitals' violations were willful and were done as part of a scheme, artifice, or device with intent to defraud or mislead, and therefore are incurable deceptive acts under the DCSA.

232.    The DCSA provides that "[a] person relying upon an uncured or incurable deceptive act may bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater. The court may increase damages for a willful deceptive act in an amount that does not exceed the greater of: (i) three (3) times the actual damages of the consumer suffering the loss; or (ii) one thousand dollars ($1,000). Ind. Code § 24-5-0.5-4(a).

233.    The DCSA provides that "[a]ny person who is entitled to bring an action under subsection (a) on the person's own behalf against a supplier for damages for a deceptive act may bring a class action against such supplier on behalf of any class of persons of which that person is a member…" Ind. Code § 24-5-0.5-4(b).

234.    Had Plaintiff and members of the Classes been aware that their Private Information would be transmitted to unauthorized third-parties, Plaintiff and members of the Classes would not have entered into such transactions and would not have provided payment or confidential medical information to Methodist Hospitals.

235.    As a direct and proximate result of Defendant's unfair and deceptive acts and practices in violation of the DCSA, Plaintiff and members of the Classes have suffered damages for which Defendant is liable.

236.    Plaintiff and members of the Classes seek actual damages plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DCSA. As redress for Defendant's repeated and ongoing violations, Plaintiff and members of the Classes are entitled to,

*inter alia*, actual damages, treble damages, attorneys' fees, and injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, KEITH CHIARO, Individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.    For an Order certifying this action as a Class action and appointing Plaintiff as Class Representatives and Plaintiff's counsel as Class Counsel;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C.    For equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Sensitive Information compromised during the Disclosure;

D.    For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E.    Ordering Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F.    For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G.    For an award of punitive damages, including those provided under the IWA, as allowable by law;

H.    For an award of attorneys' fees under the DCSA, the common fund doctrine, and

any other applicable law;

I.      Costs and any other expenses, including expert witness fees incurred by Plaintiff

        in connection with this action;

J.      Pre- and post-judgment interest on any amounts awarded; and

K.      Such other and further relief as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, pursuant to Indiana Trial Rule 38(B), hereby demands a trial by jury on all issues

so triable.

Dated: August 11, 2023                      Respectfully submitted,

                                            _____/s/ Lynn A. Toops_____
                                            Lynn A. Toops (No. 26386-49)
                                            Amina A. Thomas (No. 34451-49)
                                            Mary Kate Dugan
                                            COHEN & MALAD, LLP
                                            One Indiana Square, Suite 1400
                                            Indianapolis, Indiana 46204
                                            (317) 636-6481
                                            ltoops@cohenandmalad.com
                                            athomas@cohenandmalad.com
                                            mdugan@cohenandmalad.com

                                            J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
                                            Andrew E. Mize (*Pro Hac Vice* forthcoming)
                                            STRANCH, JENNINGS & GARVEY, PLLC
                                            The Freedom Center
                                            223 Rosa L. Parks Avenue, Suite 200
                                            Nashville, Tennessee 37203
                                            (615) 254-8801
                                            (615) 255-5419 (facsimile)
                                            gstranch@stranchlaw.com
                                            amize@stranchlaw.com

                                            Samuel J. Strauss (*Pro Hac Vice* forthcoming)
                                            Raina Borelli (*Pro Hac Vice* forthcoming)
                                            TURKE & STRAUSS, LLP
                                            613 Williamson St., Suite 201
                                            Madison, Wisconsin 53703

(608) 237-1775
(608) 509-4423 (facsimile)
sam@turkestrauss.com
raina@turkestrauss.com

***Counsel for Plaintiff and the Proposed Class***